Filed 9/10/14  P. v. Valencia CA4/1
Opinion following rehearing

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062774 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD208824) |
| DAVID VALENCIA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, John S. Einhorn, Judge.  Judgments affirmed as modified and remanded with directions.

Eric Larson, by appointment of the Court of Appeal, for Defendant and Appellant David Valencia.

Mark D. Greenberg, by appointment of the Court of Appeal, for Defendant and Appellant Jose Olivera Beritan.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

In May 2012 a jury convicted David Valencia and Jose Leonel Olivera-Beritan (Beritan), who are members of the Los Palillos criminal organization that broke ties with the Arellano-Felix Organization in Mexico and relocated to San Diego, of numerous crimes committed between January and June 2007. Specifically, the jury returned the following verdicts on the nine counts alleged in the amended information:

> *Count 1* (charged against Beritan only): *Guilty* of attempted kidnapping of Arturo Martinez-Berrera (Pen. Code,[1] §§ 207, subd. (a) & 664), with true findings on allegations that (1) a principal personally used a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)), and (2) Beritan committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).
>
> *Count* 2 (charged against Beritan only): *Not guilty* of robbery of Ivan Lozano-Valdez, Jr. (§ 211).
>
> *Count 3* (charged against Beritan only): *Guilty* of first degree murder of Lozano (§ 187, subd. (a)), with true findings on (1) an allegation Beritan committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and (2) special circumstance allegations that Beritan committed the murder during the course of a kidnapping (§ 190.2, subd. (a)(17)(B)), and he committed the murder while he was an active participant in a criminal street gang and he carried out the crime to benefit the gang (§ 190.2, subd. (a)(22)).
>
> *Count 4* (charged against both Valencia & Beritan): *Guilty* of kidnapping for ransom of Cesar Uribe (§ 209, subd. (a)), with true findings on allegations that (1) the victim suffered great bodily harm or was intentionally confined in a manner that exposed him to a substantial likelihood of death (§ 209, subd. (a)), and (2) defendants

---

[1]     All further statutory references will be to the Penal Code.

2

committed the crime for the benefit of a criminal street gang
(§ 186.22, subd. (b)(1)).

*Count 5* (charged against both defendants):  *Guilty* of first degree murder of Uribe (§ 187, subd. (a)), with true findings on (1) allegations that the defendants committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), (2) a special circumstance allegation that Beritan (but not Valencia) committed the murder during the course of a kidnapping (§ 190.2, subd. (a)(17)(B)), and (3) special circumstance allegations that the defendants committed the murder while they were active participants in a criminal street gang and they carried out the crime to benefit the gang (§ 190.2, subd. (a)(22)).

*Count 6* (charged against both defendants):  *Guilty* of the lesser included offense of simple kidnapping of Marc Anthony Leon, Jr. (Leon) (§ 207, subd. (a)), with true findings on allegations that the defendants committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

*Count 7* (against both defendants):  *Guilty* of first degree murder of Leon (§ 187, subd. (a)), with true findings on (1) allegations that the defendants committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), (2) a special circumstance allegation that Beritan (but not Valencia) committed the murder during the course of a kidnapping (§ 190.2, subd. (a)(17)(B)), and (3) special circumstance allegations that the defendants committed the murder while they were active participants in a criminal street gang and they carried out the crime to benefit the gang (§ 190.2, subd. (a)(22)).

*Count 8* (charged against Beritan only):  *Guilty* of conspiracy to commit kidnapping for ransom of Eduardo Gonzalez-Tostado (Tostado) (§§ 182, subd. (a)(1) & 209, subd. (a)), with true findings on allegations that (1) a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), and (2) Beritan committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

*Count 9* (charged against Beritan only):  *Guilty* of kidnapping Tostado for ransom (§ 209, subd. (a)), with true findings on allegations that (1) the victim suffered great bodily harm or was intentionally confined in a manner that exposed him to a substantial likelihood of death (§ 209, subd. (a)), (2) a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), and (3) Beritan

3

committed the crime for the benefit of a criminal street gang
(§ 186.22, subd. (b)(1)).

The jury also found true special circumstance allegations that (1) as to murder counts 3, 5 and 7, Beritan was convicted in this proceeding of more than one murder in the first or second degree within the meaning of section 190.2, subdivision (a)(3); and (2) as to murder counts 5 and 7, Valencia also was convicted in this proceeding of more than one murder in the first or second degree within the meaning of section 190.2, subdivision (a)(3).

In sum, the jury convicted *Beritan* of four substantive crimes: counts 1 (attempted kidnapping of Martinez), 3 (first degree murder of Lozano), 8 (conspiracy to commit kidnapping for ransom of Tostado), and 9 (kidnapping for ransom of Tostado); and also convicted *both Valencia and Beritan* of four additional crimes: counts 4 (kidnapping for ransom of Uribe), 5 (first degree murder of Uribe), 6 (simple kidnapping of Leon), and 7 (first degree murder of Leon).

The court sentenced Valencia to a total state prison term of two consecutive terms of life without the possibility of parole plus a consecutive term of 15 years. The court sentenced Beritan to a total state prison term of five consecutive terms of life without the possibility of parole, plus a consecutive term of 25 years to life, plus a consecutive term of 19 years.

*Contentions*

Valencia and Beritan separately appealed. Valencia appealed first, stating he would join any arguments raised by Beritan that "may accrue to [his (Valencia's)]

4

benefit." Valencia contended (1) his convictions of kidnapping and murdering Uribe and Leon (counts 4−7) must be reversed because his prosecution for those four crimes was barred by the prohibition against multiple prosecutions set forth in section 654 as a result of his prior negotiated plea of guilty to a charge of kidnapping Tostado for ransom, because (Valencia claims) the Tostado kidnapping and the crimes against Uribe and Leon were "part of the same course of conduct"; (2) his trial counsel provided ineffective assistance by failing to raise this issue in the trial court;[2] and (3) his abstract of judgment should be modified to correct certain errors (discussed, *post*).

Beritan later appealed, contending (1) his convictions of counts 1 (attempted kidnapping of Martinez), 3 (murder of Lozano), and 4 through 7 (kidnappings and murders of Uribe and Leon) must be reversed because there was insufficient evidence, apart from the accomplice testimony of Guillermo Moreno-Garcia (Moreno) and Carlos Pena, to connect him to the commission of those crimes; and (2) his abstract of judgment should be modified to correct certain errors (discussed, *post*).

The People acknowledged Valencia's and Beritan's abstracts of judgment should be corrected.

*Unpublished Opinion and the Attorney General's Petition for Rehearing*

In an unpublished opinion filed on July 15, 2014, we affirmed Valencia's and Beritan's convictions but modified Valencia's judgment by ordering that his sentence of

---

2    Valencia also raised this claim of ineffective assistance of counsel in his companion petition for writ of habeas corpus (case No. D063966), which we addressed separately and denied.

life without the possibility of parole for his count 7 first degree murder conviction be set aside and that a modified sentence of 25 years to life be imposed in its place. We modified Valencia's count 7 sentence at his urging because the Attorney General appeared to agree with his argument. We remanded the matter with directions to correct certain errors in the abstracts of judgment.

By order dated August 7, 2014, we granted the Attorney General's petition for rehearing in which the Attorney General requested that this court "modify [the] disposition to specify that, while the multiple[-]murder special circumstance on count 7 is stricken, because a properly imposed gang[-]murder special circumstance applies to count 7, Valencia's sentence on that count remains life without possibility of parole." !(Pet. p. 3)! In his answer to the petition for rehearing, Valencia agreed with the Attorney General, stating that "the appropriate disposition is to strike the multiple[-]murder special circumstance on count [7], but that [his] sentence for count [7] would remain life without the possibility of parole in light of the remaining gang[-murder] special circumstance."

Accordingly, we affirm Valencia's and Beritan's judgments, including Valencia's original count 7 prison sentence of life without the possibility of parole in light of the jury's true finding on the count 7 gang-murder special circumstance allegation.

FACTUAL BACKGROUND[3]

1. *Background regarding the Los Palillos cartel*

A cartel is an organization that controls criminal activity in a given geographic area. Lieutenants work for associates, and cells work for lieutenants. Members of cells are known as soldiers. They are very poorly paid and perform the undesirable tasks. Making money is the primary goal of a cartel. A cartel obtains money by trafficking drugs, accepting payments from those who are involved in criminal activity, and kidnapping for ransom.

Around 1986 a cartel known as the Arellano-Felix Organization (the AFO, also known as the Tijuana Cartel), headed by Benjamin Arellano-Felix and his brother, Ramon,[4] took over the lucrative drug-trafficking "Tijuana corridor" by which drugs─cocaine, heroin, marijuana, and methamphetamine─are moved from Mexico into the United States. The AFO had a business relationship with Colombian drug lords and controlled the supply routes from Colombia to the United States through the Tijuana corridor. Benjamin was the leader of the AFO and made all of the command decisions. Ramon was his enforcer and right-hand man who would intimidate rival drug traffickers and cultivate relationships with corrupt officials. By the early 1990's thousands of people

---

[3]    Valencia and Beritan do not challenge the sufficiency of the prosecution's gang evidence. Accordingly, we do not summarize that evidence here.

[4]    We sometimes refer to individuals involved in this case by their first names solely for the sake of clarity.

7

worked for the AFO in various roles. Benjamin was arrested in March 2002, and Ramon died in February 2002 in a shootout in Mexico.

Benjamin and Ramon's brothers, Javier Arellano-Felix and Eduardo Arellano-Felix, took over the leadership of the AFO cartel, and its violent activities increased both as a result of rivalries as other drug traffickers tried to take over supply routes in the Tijuana corridor and as a result of using other methods for obtaining money. The cartel started committing other crimes, such as kidnapping for ransom and extortion. When Javier was arrested in Mexico in August 2006, the leadership of the AFO was transferred to the Arellano-Felix brothers' nephew, Fernando Sanchez-Arellano.

Victor Rojas-Lopez, whose nickname was "El Palillo" (which means "the toothpick") was the leader of an AFO cell in Tijuana. The cell called itself Los Palillos.

Another AFO cell was run by Javier's brother-in-law, Jorge Briseno-Lopez (nicknamed "Cholo").

In 2002 Cholo and one of Victor's subordinates in the Los Palillos cell got into an argument in a bar club over a girl, which caused friction between the two AFO cells. Victor intervened in the argument. As a consequence of the argument, the AFO ordered the murder of Victor.

After Victor's murder in late 2002, his brother—Jorge Rojas-Lopez, who was a member of Victor's Los Palillos cell—fled Tijuana, and he and the cell split from the AFO and relocated to San Diego. The cell kept its name, Los Palillos.

Los Palillos was connected to kidnappings and homicides committed in San Diego between 2004 and 2007, including a triple murder in August 2004, the murder of a man

8

nicknamed "Camaron" in August 2005, and the kidnapping of Abelino Inzunza-Uriarte on April 13, 2006.

The victims of the triple murder were drug traffickers working for the AFO. They were lured to a home, where they were killed and their money and drugs were stolen. The victims' bodies were left in a vehicle that was driven from the home and parked on a residential street in Chula Vista. Warning signs to the AFO were written in the dust on the vehicle.

In June 2007 the members of Los Palillos included Jorge Rojas-Lopez (nicknamed "Palillo" or "Jorgillo"); Guillermo Moreno-Garcia ("Memo"); his half-brother, Carlos Pena ("Morro"); Jesus Gonzalez Trujillo; Juan Francisco Estrada-Gonzalez; Jose Carlos Rangel Hernandez, Jesus Lopez-Becerra; his brother, Gerardo Gabriel Lopez-Becerra; Jorge Moreno; Juan Laureano-Arvizu ("Chaquetin"); Ernesto Ayon; Juan Frausto-Lopez; Ponciano Lopez-Frausto; Pedro Corrales; Eduardo Monroy ("El Arquitecto"); Nancy Michelle Mendoza-Moreno; defendant Jose Olivera-Beritan ("Chino" or "Asere"); and defendant David Valencia. Many of the members also used aliases, including Beritan, whose aliases were Onel Jimenez and William Smith. Beritan was born in Havana, Cuba.

2. *Properties connected to Los Palillos*

a. *The Garber Avenue safe house*

In 2006 Emmanuel Nwagbo owned a two-story, five-bedroom residence located on Garber Avenue in the Paradise Hills area of San Diego. Nwagbo testified that on October 16 that year, a man named Ignacio Peredo and a woman named Norma Berumen

9

signed a one-year agreement to rent the property. Berumen was with two children and another man she said was her husband.

In December 2006 Berumen told Nwagbo that Peredo was her brother. Suspicious about who was living in the residence, Nwagbo went there and met Peredo. However, Nwagbo was not allowed inside the house.

The rent was paid regularly until January 2007, when the payments stopped. Nwagbo called Peredo, who sent by overnight mail a rent payment in the form of a money order for April and May 2007. The package was from a UPS store and the return address was in the name of Onel Jimenez (Beritan's alias).

b. *The Point Dume Court safe house*

On May 26, 2007, a real estate agent rented a residence located on Point Dume Court in Chula Vista to a Mexican citizen named Luis Armando Gonzalez-Perez. The agent knew Valencia, having rented a different home in Eastlake to him on an earlier occasion.

c. *The horse ranch*

In 2007 Gilberto Corral owned a 15-acre horse ranch in Imperial Beach less than 10 miles from the border. Corral leased some stables to Fabian Gonzalez, and Gonzalez subleased stables to others, including Valencia, Uribe, and Gonzalez's brother, Adrian.[5] Ernesto Ayon slept at the property Gonzalez rented from Corral and helped clean and feed the horses.

---

[5] Gonzalez's brother, Adrian, is not the major league baseball player with the same name who once played with the San Diego Padres.

10

In May 2007 Gonzalez owned a Caterpillar Bobcat machine that he kept at the horse ranch and used to clean stables, level the ground, and move heavy items. Gonzalez allowed Ayon to drive the Bobcat to clean the stables.

3. *Uncharged kidnapping of Jorge Garcia-Vasquez*

Jorge Garcia-Vasquez (Vasquez or "Kilino") testified he is the brother-in-law of a high-ranking member of the AFO. In early 2007 a woman named Nancy (Nancy Michelle Mendoza-Moreno) approached him in a gym in Chula Vista. Vasquez began exercising with her there and they became friends. Nancy drove a gray Chevrolet Equinox with tinted windows.

On January 31, 2007, while Vasquez and Nancy were working out at the gym, Nancy told Vasquez she wanted to buy some food supplements and needed his help selecting them. Vasquez agreed. Nancy insisted that they leave Vasquez's car at the gym and that she drive them in her car. After they left the gym, Nancy received a telephone call. Vasquez heard Nancy tell the caller, "Oh, that's fine." Nancy then told Vasquez her aunt had forgotten her house keys, and she needed to take the keys to her aunt's house and leave them under the door mat.

Vasquez testified that Nancy drove them to the 805 freeway, took the 805 to the 54, exited at Reo Drive, looked in her rearview mirror with a serious and somewhat worried expression on her face, and then stopped on a small side street where there were no homes. A white van pulled up behind them and some men wearing military-style clothing and looking like police officers got out of the van and approached Nancy's car.

11

The men, whom Vasquez described at trial as "Mexicans," knocked on the doors of Nancy's car and yelled "police."

Doubting the men were police officers, Vasquez locked the car doors, but Nancy pressed the release mechanism and unlocked them. Some of the men pulled Vasquez out of Nancy's car, but he fought back. The men punched Vasquez and one of them used a Taser to tase his left chest. The men lifted Vasquez into the van, tied his hands behind his back, blindfolded him, and taped his legs together. They then drove him to a house. Vasquez learned he had been kidnapped when one of the men said he wanted $2 million.

Vasquez was held in a closet on the second floor of the house for just over three weeks. Two men were in charge of guarding him. Vasquez testified that one was Mexican, and the other was a foreigner with a Cuban or Venezuelan accent, and he knew them as "Juanito" and "El Cubano," respectively.

4. *Attempted kidnapping of Martinez* (*count 1, charged against Beritan only*)

Arturo Martinez-Barrera (Martinez) testified that he was serving a federal prison sentence in Virginia following his arrest there in 2007 and his conviction of conspiracy to possess and distribute marijuana. Martinez was an independent drug trafficker who did not work for any large organization and sold only to Americans.

In late December 2006 Martinez came to San Diego for the holidays and planned to return home in early January. While Martinez was in San Diego, Juan Laureano-Arvizu ("Chaquetin") told him that he (Martinez) owed Jorge Palillo ("Jorgillo") some money for a drug debt. Martinez denied he owed any such debt and told Arvizu to

12

contact Palillo because Martinez wanted to "face him" and clear everything up.  Arvizu called Palillo.

Later, around Christmas, Arvizu again told Martinez he owed money to Palillo.  At Martinez's request, Arvizu called Palillo and placed him on the speakerphone.  Palillo cursed, said "call me later," and hung up.

On January 3, 2007, Martinez was walking toward his Toyota Sequoia.  Arvizu followed him outside, started talking to him about his (Martinez's) plan to leave the next day and suggested they go out for drinks.  Martinez suggested that Arvizu get some cocaine and ask Lourdes Hernandez to invite her sister or a friend so they could have a party.  Lourdes accompanied Arvizu, thinking they were going out for drinks.  Arvizu told Martinez to follow him in his own car.  Martinez gave Arvizu $50 for the cocaine he was going to buy.

Martinez got into his Sequoia alone.  Arvizu and Lourdes got into Arvizu's Ridgeline pickup truck.  Martinez followed as Arvizu drove away.

Martinez followed Arvizu to the Briarwood apartment complex.  Arvizu told Lourdes he was going to pick up the cocaine there.

Martinez parked behind Arvizu's truck in the apartment complex parking lot and waited for Arvizu to pick up the cocaine.  As he was getting out of the car, Arvizu told Lourdes, "If you see anything weird, leave."  Arvizu got out of his pickup truck, leaving Lourdes in the car.

Arvizu knocked on the door of one of the upstairs apartments.  No one answered the door.  Arvizu waited by the door for about five minutes.  Thinking something was

13

wrong, Martinez drove forward, made a U-turn, and pulled up next to the passenger's side of Arvizu's truck, facing the way out of the apartment complex and intending to ask Lourdes what was going on.

A white Town and Country minivan and a black station wagon then came down the hill. The minivan parked next to Martinez and the station wagon parked in front of him, blocking him from exiting the parking lot.

Two men exited the station wagon, and several out-of-shape Hispanic men got out of the minivan. They were dressed in black and had police gear, including hats, bulletproof vests, and badges hanging from their necks. The men surrounded Martinez's car. They banged on the windows of Martinez's car with their handguns, pointed guns at him, and yelled at him in English and Spanish to get out of the car. The men shouted they were with the FBI.

Suspecting the men were not law enforcement officers and they were there to kidnap him, Martinez put his car in reverse. The men started shooting at Martinez from both sides of his car and some of the bullets struck him. Martinez then put his car in drive and drove through an opening between the station wagon and the minivan, hitting the minivan, and and then drove away.

Lourdes testified that after Martinez drove away from the Briarwood apartment complex, Arvizu entered the passenger's side of his truck and Lourdes, who was driving, started to drive away. Lourdes testified that before Martinez drove away, when Arvizu was still outside the truck, Arvizu held up his hands and shrugged his shoulders as if to suggest he had no idea what just occurred. As Lourdes drove by one of the buildings,

14

however, Arvizu told her to slow down, and then the men from the minivan who had assaulted Martinez jumped into the back seat of the four-door truck

Lourdes also testified that she drove them to a house in Chula Vista following Arvizu's directions. When shown a photograph of the Garber Avenue residence at trial, Lourdes testified she recognized the house as the one to which she, Arvizu, and the two men wearing police vests had driven following the incident at the Briarwood apartment complex. Lourdes also testified that "Memo" (Los Palillos member Guillermo Moreno, whose accomplice testimony is discussed, *post*) was there, along with his girlfriend and another man Lourdes did not recognize.

5. *Murder of Lozano* (*count 3, charged against Beritan only*)

In 2007 Ivan Lozano-Valdez, Jr. ("Junior") was living in Tijuana. He was a drug user who would get into trouble. Lozano travelled to Chula Vista frequently to visit a couple whose last name was Briseno, because the husband, Jose, had been diagnosed with terminal cancer.

On March 23, 2007, Lozano called Jose, said he was at the border, and asked Jose to pick him up. The Brisenos picked up Lozano and drove him to their home. They arrived there at around 1:30 p.m. The Brisenos planned to drive Lozano back to the border after dinner. Before dinner was prepared, Lozano received a call from a friend on his Nextel phone. Lozano turned off the speaker so that no one could hear the conversation. When the conversation was over, Lozano told the Brisenos he was going to meet his friend and would be back in about 15 minutes.

15

Someone picked up Lozano 10 minutes later. Lozano did not return as planned. After waiting for an hour and a half, Jose called Lozano. Lozano sounded agitated and said he was on the street. Lozano's friends and family never heard from him again. His family did not receive any calls from kidnappers demanding ransom payments in return for his release.

Gerardo Gaxiola testified that in late March 2007, he parked his Chrysler Concord in a large parking area near a dumpster at the apartment complex on Santa Rita Drive in Chula Vista where he lived. In the early morning hours of March 24, Gaxiola found his car was gone.

Later that morning George Hoff saw the Concord parked in his neighborhood in Clairemont. A neighbor called the police, but they did not respond. In early April 2007, another neighbor called the police and reported a strange odor emanating from the car.

San Diego Police Officer Jeff Willkomm responded to the call. Lozano's decomposing body was found in the trunk of the car. Toothpicks were strewn on and around the body. FBI Agent Dean Giboney, the prosecution's gang expert, opined that the toothpicks were left as a calling card and indicated that Los Palillos committed the crime.

Steven Campman, M.D., a forensic pathologist, performed an autopsy on Lozano's body. Dr. Campman opined that a set of paired injuries on Lozano's back appeared to have been caused by a Taser. He also testified Lozano had other paired and crescent-shaped injuries that were caused by a Taser; and Lozano's wrists were discolored, indicating they had been bound prior to Lozano's death. Dr. Campman determined that

16

the cause of Lozano's death was homicidal violence, including asphyxiation, and the manner of death was homicide.

6. *Kidnappings and murders of Uribe and Leon* (*counts 4 through 7*)

a. *Uribe* (*counts 4 & 5, charged against both Beritan and Valencia*)

In May 2007 Cesar Uribe was a marijuana trafficker who lived with his wife, Veronica Gamez, in Eastlake. Like Leon, Uribe disappeared on May 3, 2007.

Before his disappearance, Uribe had a drug-trafficking business relationship with his close friend. Antonio Sanchez-Salas, who used an alias─Roberto Palafax─because he was in the United States illegally. Uribe would obtain marijuana and Palafax would take it to Cleveland and sell it to their clients, who were other drug dealers.

Uribe and Gamez met Valencia in late 1999. They all became close friends. Valencia and his brother joined Uribe in the marijuana-trafficking business. However, the business relationship ended in 2004, and Uribe started working with Palafax as his partner.

Gamez testified that Valencia and Uribe remained friends for awhile, and they both moved to Eastlake. However, their friendship ended in March 2007 due to a quarrel over drug trafficking.

Valencia rented his home from Fabian Gonzalez's brother, Adrian. Valencia's monthly rent was about $4,500, and he frequently was behind on his rent.

Adrian testified that in May 2007 Valencia was two months behind on his rent, and he (Adrian) tried to collect the $9,000 owed from him. Valencia told Adrian that

17

Uribe owed him $70,000, and he (Valencia) would pay the rent when he received the money from Uribe.

On May 3, 2007, shortly before 8:30 a.m., Adrian telephoned Uribe while Uribe was about to leave the house with Leon. Adrian asked Uribe whether he owed Valencia money. Uribe became very angry, cursed, denied that he owed money to Valencia, said that Valencia was lying, and told Adrian he did not know what Adrian was talking about.

Valencia then called Uribe, also before Uribe and Leon left the house that morning, and told Uribe they needed to talk. Uribe told Valencia he was on his way out and would call back as soon as he was in the car. Uribe, accompanied by Leon, then left the house for the last time.

Later that day, Palafax, who was in Cleveland, received a call from a man he did not know and learned that Uribe had been abducted. Palafax testified that the man called from Uribe's Nextel phone using the "push to talk" feature. The man told Palafax, in Spanish, that they knew he was on the East Coast, they had his friend (Uribe) and nothing was going to happen, but it was "not a game" and they would call him again in 30 minutes with instructions. The man called back and demanded half a million dollars. When Palafax told the man "We ain't got that kind of money," the man told Palafax he knew everything about Palafax and his family, and then threatened to kill Uribe if Palafax called the police. When Palafax asked the man about Leon, he said they also had the "stupid homey" with them.

Palafax called Uribe's wife, Gamez, to let her know what was going on. Palafax flew to San Diego.

Palafax, Gamez, and Uribe's family began raising money to secure Uribe's release. Eventually, they raised about $50,000.

On May 10, the man who had spoken to Palafax called him again to arrange the ransom drop. The ransom money was delivered to two armed men at the Briarwood apartment complex.

Later, one of the kidnappers called Palafax again and told him that $50,000 was a "joke" and they would give him a week to come up with more money. Uribe's brother-in-law agreed to do the second ransom drop. Following instructions, he delivered the ransom money to a specified location in National City. No one ever heard from Uribe again. On May 24, 2007, Uribe's family called the police.

b. *Leon* (*counts 6 & 7, charged against both Beritan and Valencia*)

In May 2007 Leon lived with his mother in Santee. Cesar Uribe was a friend of Leon's On May 3, 2007, when Leon's mother returned from work at 5:00 p.m., Leon was gone and he never returned home. No one called Leon's family with a ransom demand.

7. *Kidnapping of Tostado* (*counts 8 & 9, charged against Beritan only*)

In May 2007 Eduardo Gonzalez-Tostado, a wealthy Mexican-born businessman, was living with his wife and daughter in Chula Vista. Tostado testified that his residence was in a gated community that required entry of a code in order to gain access. When Tostado and his family moved in around May 2005, he had some remodeling work done to the home. Los Palillos member Eduardo Monroy ("El Arquitecto") did the work. Tostado gave Monroy the gate access code to allow him to do the work.

19

Tostado testified that he and Valencia had been friends. However, Tostado had a falling out with Valencia in 2003 or 2004, and they no longer communicated with one another.

One evening in May 2007, when Tostado returned home from work, he found a note in Spanish on his doorstep with a name and a phone number. The note said to call "Roberto" regarding an urgent matter. Although Tostado did not know the man, Tostado's cousin, Sergio Tostado, recognized him as Arvizu ("Chaquetin"), who was a Los Palillos member.

Afraid he might be the potential victim of a kidnapping, Tostado told his wife to contact the FBI if anything happened to him. Tostado called the number written on the piece of paper, a man (Arvizu) answered the phone, and identified himself as Roberto. Tostado asked Arvizu to describe the nature of the urgent matter. Arvizu said he needed to talk to Tostado in person because "they" were trying to kidnap him (Tostado). Tostado asked Arvizu who he meant by "they," and Arvizu responded that a dangerous "group of people" were doing to do it. Arvizu told Tostado that if he gave Arvizu $50,000, Arvizu would let him know who "they" were. Arvizu asked Tostado to meet him in a public place and bring cash, and Tostado told Arvizu he would call him back.

Tostado called Arvizu later from his restaurant in Tijuana. Tostado told Arvizu he knew his name was "Chaquetin" and offered him $5,000 if he would come to the restaurant and provide him with the information. During the conversation, Arvizu told him that Monroy had given the kidnappers the gate access code to Tostado's home.

20

Around the same time period, a mutual friend of Tostado and Valencia's told Tostado that Valencia was trying to reach him (Tostado). Tostado used the friend's phone to call Valencia, and they agreed to meet for coffee. While the two had coffee together, Valencia told Tostado he needed to buy a pickup truck and a car and gave Tostado a cashier's check for $40,000.

In early June 2007 Valencia and Tostado went to look at cars, and Tostado purchased two vehicles at an auction the next day. Valencia made arrangements to meet in a couple of days with Tostado at a Starbucks in Chula Vista to pay the balance he owed on the vehicles and arrange for their delivery.

On June 8, 2007, when Tostado and Valencia met at the Starbucks, Valencia said he was expecting a friend who wanted to sell Tostado a nice BMW. That person never arrived. Instead, an attractive Mexican woman came to the table and talked to Valencia in Spanish. Valencia introduced her as his friend, Nancy. Shortly thereafter, Nancy spoke with Valencia again and left.

As Nancy drove away, she telephoned Valencia. Valencia then told Tostado that Nancy liked him and wanted to go out with him for drinks. Tostado called Nancy and made plans to pick her up at a coffee shop. When he got there, Nancy was waiting outside. She told him she wanted to go to a certain bar in Tijuana, Nancy asked Tostado to follow her in his car.

Tostado testified that he followed Nancy to a house (the Point Dume Court safe house) at the end of a street in a cul-de-sac. Nancy went inside the house and told Tostado when she returned that her aunt was not home, and they could have drinks in the

21

house.  Tostado agreed.  He told her he had to leave, but would return in a few minutes.  When he returned, Nancy let him in.

All of a sudden, three men wearing ski masks and police gear ran towards Tostado from the hall.  They were armed with rifles.  Two of the men grabbed Tostado and the third struck him in the face and stomach with a rifle.  Tostado felt a lot of Taser strikes on his back, and he fell to the floor.  The men continued to kick and hit him, and he passed out.

Tostado testified that when he regained consciousness, he was face down with his legs and hands cuffed behind him and someone sitting on his back.  Tostado, who was blindfolded, heard Nancy say she was leaving.  Another man told her to take Tostado's car.

Tostado testified the three kidnappers referred to themselves as Boss 1, Boss 2, and Boss 3.  Boss 1 did most of the talking.  Boss 1 told Tostado not to do anything stupid, they wanted money, and then they would let him go.  He asked Tostado for $2 or $3 million dollars.  Tostado said he did not have that much money, and Boss 1 responded that he had investigated Tostado, looked at his home and his businesses, and knew he could come up with the money.  Boss 1 added that the "Architect" (Monroy) had given them the gate access code to Tostado's home.

Boss 1 told Tostado they had kidnapped Kilino (Vasquez, the brother-in-law of a high-ranking AFO member) and indicated they had killed Junior (Lozano).  Boss 1 said that if Tostado came up with $1 million, "they would let him go.  Boss 1 added that he was angry with the AFO because they killed his brother, El Palillo.  He accused Tostado

22

of being friends with the AFO. Tostado told Boss I that he (Tostado) had nothing to do with his brother.

Tostado indicated at trial that he learned the nicknames of three of the kidnappers. Tio (Raul Rojas-Gamez) was the cook who told him not to "do anything stupid" or they would kill him. Morro (Pena) and Asere (Beritan) were in charge of the house and were responsible for guarding Tostado. Pena guarded Tostado during the day and Beritan guarded him at night.

Tostado also testified that Beritan had a Cuban accent and was constantly using his laptop computer. Beritan told Tostado he had been a truck driver in Cuba before he moved to Miami, Florida. Beritan also told Tostado he had been driving a Chevy Equinox and conducting surveillance outside Tostado's house at the time of Tostado's kidnapping.

Tostado testified he expressed concern about his safety, noting he had seen Nancy's face. Tostado promised Beritan that if they let him go, he would not identify her. Beritan responded by telling Tostado they had taken Kilino (Vasquez), who had been there for a month, had paid the ransom, and had been released. Beritan assured Tostado he would have "no problem" because Vasquez was not killed even though he, too, had seen Nancy.

FBI Special Agent Lauren Wood testified that, during her investigation, she was able to identify Boss 1 as Jorge Rojas-Lopez (Rojas). A complex, multiagency operation was set up to track and apprehend the kidnappers.

23

By June 15, $193,000 in ransom money had been raised. That day, one of the kidnappers called Tostado's cousin, Sergio, and told him to await further instructions. Also that same day, Sergio took the money to the FBI office, where some of the bills were marked and photographed, and they were all placed in a briefcase containing a tracking device. Wiretap warrants were obtained.

Tostado's wife notified Agent Wood that a ransom drop was planned for June 16. In the afternoon on June 16, Agent Wood and two other agents met with Tostado's wife and Sergio, and the agents gave Sergio the briefcase containing the marked money and told him to follow the kidnapper's instructions. While Sergio was with the agents, one of the kidnappers contacted him and gave him instructions about the ransom drop.

Law enforcement agents had placed a digital body recorder on Sergio so they could listen to anything he heard or said, including anything said during calls from the kidnappers, and thereby follow him during the ransom drop, but the audio did not work and they lost his trail. Using the beacon signal in the briefcase of money, agents tracked the briefcase to a Mitsubishi Lancer with Baja license plates. Through surveillance, the police determined that the Lancer was being driven by a lone Hispanic male, who picked up a second man. The men, later identified as Juan Estrada-Gonzalez (Estrada) (who was the driver) and Rojas, drove to the Point Dume Court safe house and entered the residence.

Rojas and Estrada were arrested as they drove the Lancer away from the Point Dume Court residence. The briefcase with the ransom money was in the car. Tio (Raul Rojas-Gamez) was arrested driving away in a separate vehicle.

24

After awhile, agents outside the house announced their presence. Pena ran outside. Tostado testified that Beritan removed Tostado's blindfold and handcuffs, put one of the handcuffs on himself, and placed the blindfold around his head to cover his eyes. Tostado opened the front door and walked outside.

Beritan came out of the Point Dume Court safe house and pretended to be a victim. Tostado informed the agents Beritan was one of the kidnappers, not a victim. Beritan was arrested. Pena was found hiding in a canyon and was also arrested.

At trial, Tostado identified Beritan as Asere and Pena as Morro.

8. *Investigation*

During the investigation, Tostado was able to identify Boss 1 and Boss 2 by their voices. Boss 1 was Rojas and Boss 2 was Estrada.

Utilities for the Point Dume Court residence were in the name of Oswaldo Barrera, an alias for Gerardo Lopez-Becerra. A Chevrolet Equinox was in the garage, and Pena's Ford Ranger was parked near the house. A receipt for caustic soda dated May 20 was in the truck.

A search was conducted inside the Point Dume Court residence. Bags of caustic soda were found under the kitchen sink. A couple of boxes of muriatic acid were found in the home. Officers also found several weapons, including AK-47-style rifles, a semiautomatic handgun, and a Taser. Also found were police vests and gear, including a ballistic vest and hats with the words "police" and "FBI" on them.

A black computer-type carrying case or bag and a Sony laptop were found in the house. The contents of the laptop bag included (1) several items indicating the bag

25

belonged to Beritan, including an immigration document in the name of "Jose Leonel Beritan-Olivera" from Cuba, a photocopy of the front of a Social Security card in the name of "Jose Leonel Beritan-Olivera," and a photocopy of a Florida driver's license in the name of Jose L. Beritan; and (2) a small blue address book containing Tostado's personal information and credit card numbers.

In October 2009, based on information provided by Pena, a law enforcement team went to the horse ranch with a search warrant. They found the liquefied remains of Leon and Uribe buried in the ground in barrels.

9. *Accomplice testimony*[6]

a. *Moreno's accomplice testimony*

In August 2008 Moreno entered into a cooperation agreement with the district attorney's office under which he would provide information regarding several homicides, kidnappings, and robberies committed by members of Los Palillos. Moreno agreed to testify truthfully in several Los Palillos cases, including this one, in return for a prison sentence of between 25 years and 33 years eight months, to be determined by the court.

Moreno testified he had worked in Tijuana for Victor Rojas-Lopez (El Palillo), who (as already noted) was the leader of an AFO cell in Tijuana. After Victor was

_____

[6] As the following accomplice testimony is primarily relevant to Beritan's claim his convictions of counts 1 and 3 through 7 are not supported by sufficient corroborative evidence, our summary of the testimony is brief and primarily focused on the portions of the testimony that pertain to Beritan's role in the commission of the various crimes involved in this case.

murdered, Moreno started selling drugs for Victor's brother, Jorge Rojas-Lopez, who wanted to "get revenge" by targeting AFO members for murdering his brother.

Moreno indicated that Los Palillos rented safe houses in the San Diego area to facilitate the crimes they planned to commit against AFO members. Specifically, Los Palillos rented the Garber Avenue and Point Dume Court residences as safe houses.

Moreno testified he was living alone in the Briarwood apartment complex when Beritan moved to San Diego. Beritan moved into the Garber Avenue safe house, as did Moreno's brother, Pena.

Moreno also testified he had seen a false Florida identification card that Beritan used. The card had a photograph of Beritan, but the name on the card was Onel Jimenez.

Moreno spoke to Beritan and a few other members of Los Palillos about making money by kidnapping AFO members for ransom. Moreno testified that Beritan had participated in a kidnapping for ransom before he moved to San Diego, and Beritan expressed interest in making money this way. Thereafter, Los Palillos started kidnapping AFO members for ransom.

i. *Kidnapping of Balitas*

The first victim was a man named Balitas. Moreno testified that Balitas's father worked for the AFO. Beritan, Moreno, Jorge Rojas-Lopez, and other Los Palillos members participated in the kidnapping. During the kidnapping, Beritan drove a car and served as a lookout. Following his abduction, Balitas was handcuffed, blindfolded, and held captive at the Garber Avenue safe house. Beritan guarded Balitas at night, and Moreno guarded him during the day. Ransom was paid and Balitas was released.

27

## ii. *Kidnapping of Vasquez*

The second victim was Vasquez ("Kilino"), whose wife was related to a financial adviser for the AFO. Some Los Palillos members arranged for Nancy Mendoza-Moreno to flirt with Vasquez at a gym, get him to go out with her, and drive him to a certain location. They would abduct him there by pretending to be law enforcement officials, "arresting" him, and then taking him to the Garber Avenue safe house.

On the day of the kidnapping, Beritan remained at the Garber Avenue house. Nancy lured Vasquez as planned and drove him to the location in a Chevrolet Equinox that later was sold to Beritan. A group of Los Palillos members, disguised as police officers, approached Nancy's vehicle in a van, directed her to pull over, forced Vasquez into the van, and took him to the Garber Avenue safe house where they held him captive.

Beritan and Moreno guarded Vasquez at the Garber Avenue safe house while he was held captive there. Moreno guarded him during the daytime, and Beritan guarded him at night.

Moreno testified that he and other Los Palillos members sometimes openly referred to Beritan as "Cuba" or "El Cubano" at the Garber Avenue safe house while Vasquez was held captive there. Ransom was paid and Vasquez was released. When Moreno arrived, Beritan, who was living there, was present with other members of Los Palillos.

Moreno testified that he and the others were told they were waiting for a call from Arvizu ("Chaquetin"), who had set up the victim─Martinez─by telling him he (Arvizu) had a buyer for some cocaine. The plan was to kidnap Martinez, take whatever drugs he

28

had, and hold him captive at the Garber Avenue safe house. Specifically, Moreno and three others would be in a stolen white Dodge Caravan, and Beritan would take a separate car and act as a lookout. Arvizu would lure Martinez to the Briarwood apartment complex, where the group would get out of the Caravan and "arrest" him. The group donned their law enforcement uniforms and put police lights on the Caravan.

When Arvizu called, most of the group drove in the Caravan to the Briarwood apartment complex, and Beritan parked up a nearby hill. With its police lights turned on, the Caravan stopped in front of Martinez's SUV. Moreno and the others in the Caravan got out and ran towards the SUV, and Moreno tried to "arrest" Martinez by pounding on the passenger window with a gun. Moreno's gun fired, and one of his cohorts fired his weapon. One of the Los Palillos members tried to block Martinez's car by putting the Caravan in reverse. Beritan drove down the hill and also tried to block Martinez in. Martinez drove forward, hitting both the Caravan and Beritan's car, and drove away. After Martinez escaped, the would-be kidnappers returned to the Garber Avenue safe house.

iv. *Lozano murder*

Regarding the Lozano murder, Moreno testified that after he learned Lozano worked for the AFO, he (Moreno), Beritan, and other Los Palillos members met at the Garber Avenue safe house and discussed a plan to kidnap or rob Lozano. Beritan was still living there.

Arvizu asked Moreno to run an errand. When Moreno returned to the Garber Avenue house, Lozano was in the dining room with his hands cuffed behind his back.

29

Later, after Lozano's mouth and legs were taped, Beritan and other Los Palillos members kicked him as Jesus Gonzalez-Trujillo strangled him to death with a belt.

After Lozano was dead, Beritan and Arvizu left to steal a car for the disposal of the body. They returned half an hour later with a gold Chrysler sedan. Beritan and Arvizu told Moreno they stole the car from the Pinnacle apartments on Santa Rita Drive in Chula Vista where they had found it parked next to a dumpster.

Moreno testified the entire group dragged Lozano's body to the Chrysler and placed it in the trunk. Beritan handed Jorge Rojas-Lopez a container of toothpicks. Rojas opened it and poured toothpicks on the body. Arvizu got in the Chrysler while the others got in a another vehicle. They abandoned the Chrysler in a residential neighborhood in the Clairemont area.

v. *Kidnappings and murders of Uribe and Leon* (*Uribe/Leon crimes*)

Regarding the kidnapping and murder of Uribe and Leon, Moreno testified that Valencia lured the victims to the Garber Avenue safe house on the pretext that Valencia would bring someone there who would sell some marijuana. After they arrived at the house, Uribe and Leon were abducted, handcuffed and blindfolded, and held captive upstairs. Beritan, who was still living at the Garber Avenue safe house, helped to guard them during their captivity there.

Beritan was present when Uribe and Leon were murdered. Jesus Gonzalez-Trujillo first murdered Leon by strangling him as he was being kicked. Some of the Los Palillos members in the house dragged Leon's naked body over to a 55-gallon metal barrel containing muriatic acid and put the body head first into it. Later, Uribe was

30

strangled to death as he was being kicked. His body was put head first into a second barrel containing muriatic acid.

Moreno testified that Beritan was present when the barrels were loaded on Pena's Ford Ranger truck. The barrels were driven to the horse ranch where they were "dumped."

Moreno later had a falling out with Los Palillos and separated from the group.

vi. *Tostado kidnapping*

Moreno testified that he was not involved in Tostado's kidnapping, and he never went to the Point Dume Court safe house.

b. *Accomplice testimony of Carlos Pena*

In late 2010 Pena, Moreno's brother, entered into a cooperation agreement with the district attorney's office whereby he agreed to give truthful testimony in return for use immunity and a sentence ranging from 26 years eight months to 39 years eight months.

Pena testified that he joined Los Palillos in 2006. Los Palillos rented safe houses, and he would hang out in them with the other members of Los Palillos. Los Palillos rented the Garber Avenue safe house in October 2006, and Pena lived there with Beritan from that time until Los Palillos abandoned that safe house.

Pena's accomplice testimony was generally consistent with Moreno's regarding the kidnapping of Balitas, the kidnapping of Vasquez, the attempted kidnapping of Martinez, the murder of Lozano, and the kidnapping and murders of Uribe and Leon.

31

### i. *Kidnapping of Balitas*

Regarding the kidnapping of Balitas, as pertinent here, Pena testified that he and Beritan helped to guard Balitas while he was held captive at the Garber Avenue safe house. During that time, both he (Pena) and Beritan lived at the Garber Avenue safe house.

### ii. *Kidnapping of Vasquez*

Regarding the kidnapping of Vasquez, Pena testified he learned before the abduction that a woman named Nancy (Nancy Michelle Mendoza-Moreno) went to a certain gym to establish a relationship with Vasquez. Pena's role in the kidnapping was to pick up Nancy after Vasquez was abducted from the Equinox she was driving, and then drive her to the border. That Equinox was later sold to Beritan and confiscated during the FBI raid at the Point Dume Court safe house on June 16, 2007. Pena testified that he and Beritan guarded Vasquez while he was held captive at the Garber Avenue safe house.

### iii. *Attempted kidnapping of Martinez*

Regarding the attempted kidnapping of Martinez, Pena testified that he, Beritan, and other Los Palillos members met at the Garber Avenue safe house to plan the kidnapping for ransom.

### iv. *Lozano murder*

Regarding the Lozano murder at the Garber Avenue safe house, Moreno testified that Beritan was present in the house when Lozano was still alive. Pena heard someone telling Lozano they knew he was with the AFO, and he had run into Los Palillos. While

32

Lozano was alive, Pena went outside to act as a lookout. When he came back inside, Lozano was face down on the floor, dead.

v. *Uribe/Leon crimes*

Pena provided some missing details regarding the Uribe/Leon murders and explained his own role in the crimes. As pertinent here Pena testified that while the victims were held captive at the Garber Avenue safe house, he, Beritan, Moreno, and another Los Palillos member took turns guarding them. Beritan usually guarded them at night. During that time, both Pena and Beritan lived at the Garber Avenue safe house.

Pena also testified that he and Beritan bought masks to protect against fumes that would be coming from the barrels, and they also purchased fans, large plastic trash bags to cover the openings of the lidless barrels , and charcoal for the barbeque. Beritan and Valencia were present when Uribe was strangled. Pena drove the barrels containing Leon's and Uribe 's remains to the horse ranch in the bed of his truck. Pena backed his truck up to a hole in the ground that was five to seven feet deep, and a Bobcat machine was used to take the barrels out of the truck. The last time Pena saw the barrels they were on the Bobcat.

Pena also testified that later, a week after he drove the barrels to the ranch, he and Beritan cleaned up the Garber Avenue safe house and washed the downstairs floor with a disinfectant.

vi. *Tostado kidnapping*

Pena testified he learned in June 2007 that Los Palillos had a new safe house—the Point Dume Court safe house. That month he moved into the new safe house. He also learned about Los Palillos's plans to kidnap Tostado.

On June 8, 2007, the day Tostado was kidnapped, Pena drove up and down the street acting as a lookout. While he was driving around as a lookout, Pena kept in phone contact with Beritan.

Pena testified that while Tostado was held captive at the Point Dume Court safe house, he (Pena), Beritan, and another member of Los Palillos guarded Tostado.

On June 16, the FBI raided the Point Dume Court safe house and arrested Pena. Pena testified that Beritan took the "bands" off Tostado and put them on himself. Beritan's Equinox was parked in the garage at the time of the raid.

DISCUSSION

I. *SECTION 654 PROHIBITION OF MULTIPLE PROSECUTIONS* (*COUNTS 4−7*)

Valencia claims his convictions of kidnapping and murdering Uribe and Leon (counts 4−7, hereafter the Uribe/Leon crimes) must be reversed because prosecuting him in this case for those four crimes violated the prohibition of multiple prosecutions under section 654 and *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*) because (1) he pleaded guilty to a charge of kidnapping Tostado for ransom before he was indicted in this case, and (2) the Tostado kidnapping and the Uribe/Leon crimes were "part of the same course of conduct." Valencia also contends his trial counsel provided ineffective

34

assistance by failing to assert in the trial court that section 654 barred his prosecution for the Uribe/Leon crimes charged in counts 4 through 7.  We reject these contentions.

A.  *Background*

On June 15, 2009, before he was indicted in this case in August 2009, Valencia pleaded guilty in *People v. Valencia* (Super. Ct. San Diego County, 2009, No. SCD207302) to aiding and abetting the kidnapping for ransom of Tostado on June 8, 2007, and admitted he committed that offense in furtherance of the Los Palillos street gang.  Valencia was sentenced to 15 years in state prison for his conviction of that offense.

B.  *Applicable Legal Principles*

Section 654, subdivision (a) provides in part that when an "act or omission . . . is punishable in different ways by different provisions of law," an "acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  This provision "bars multiple prosecutions for the same act or omission where the defendant has already been tried and acquitted, or convicted and sentenced."  (*People v. Davis* (2005) 36 Cal.4th 510, 557 (*Davis*).)

The leading case on the section 654 bar against multiple prosecutions is *Kellett, supra*, 63 Cal.2d 822.  (*Davis, supra*, 36 Cal.4th at p. 557.)  In *Kellett*, the defendant was initially charged with the misdemeanor offense of exhibiting a firearm in a threatening manner (§ 417), and he was charged one month later with the felony offense of being a felon in possession of a firearm (former § 12021).  (*Kellett,* at p. 824.)  Both charges arose out of the defendant's standing on a public sidewalk while holding a pistol.  (*Ibid.*)

Two months after he was charged with the felony, he pleaded guilty to the misdemeanor charge and was sentenced for that offense. (*Ibid.*) The defendant then moved for dismissal of the felony charge, arguing it was barred by section 654, and the trial court denied his motion. (*Kellett,* at p. 824.) The California Supreme Court held that prosecution of the felony charge was barred under section 654, stating: "When, as here, the prosecution is or should be aware of more than one offense *in which the same act or course of conduct plays a significant part*, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett*, at p. 827, italics added.) The *Kellett* court explained that such a bar is needed to avoid "needless harassment" of defendants and "waste of public funds." (*Ibid.*; see also *Davis*, 36 Cal.4th at p. 557 ["This preclusion is primarily 'a procedural safeguard against harassment.'"].)

Thus, under the *Kellett* rule, the section 654 prohibition of multiple prosecutions "applies only where 'the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part.'" (*People v. Valli* (2010) 187 Cal.App.4th 786, 796 (*Valli*), quoting *Kellett, supra*, 63 Cal.2d at p. 827.)

However, the section 654 prohibition of multiple prosecutions does not apply under the *Kellett* rule when "[t]he crimes were committed at different locations, at different times, against different victims, and with different objectives." (*People v. Ward* (1973) 30 Cal.App.3d 130, 136; see also *People v. Cuevas* (1996) 51 Cal.App.4th 620,

36

624 ["*Kellett* does not require, nor do the cases construing it, that offenses committed *at different times and at different places* must be prosecuted in a single proceeding."])

In deciding whether the same act or course of conduct plays a significant part in more than one offense, thereby triggering application of the section 654 prohibition of multiple prosecutions under the *Kellett* rule, "[w]hat matters is . . . the totality of the facts, examined in light of the legislative goals of sections 654 and 954[7] as explained in *Kellett*." (*People v. Flint* (1975) 51 Cal.App.3d 333, 336 (*Flint*)). "More specifically, if the evidence needed to prove one offense necessarily supplies proof of the other, . . . the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds." (*People v. Hurtado* (1977) 67 Cal.App.3d 633, 636 (*Hurtado*).)

However, in determining whether the section 654 prohibition of multiple prosecutions applies under the *Kellett* rule, "[t]he evidentiary test of *Flint* and *Hurtado* requires more than a trivial overlap of the evidence. Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*." (*Valli*, *supra*, 187 Cal.App.4th at p. 799.) Thus, successive prosecutions are not barred when "[d]ifferent evidentiary pictures are required . . . [or] [d]ifferent witnesses would testify to the events." (*Ibid.*)

---

7    Section 954 provides in part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

1. *Standard of review*

"On appeal, we review factual determinations under the deferential substantial evidence test, viewing the evidence in the light most favorable to the People. [Citation.] We review de novo the legal question of whether section 654 applies." (*Valli*, *supra*, 187 Cal.App.4th at p. 794.)

C. *Analysis*

Valencia has failed to meet his burden of showing section 654 barred his prosecution under the *Kellett* rule for the Uribe/Leon crimes charged in counts 4 through 7 following his conviction and sentencing for aiding and abetting the Tostado kidnapping based on his guilty plea. As already discussed, the section 654 prohibition of multiple prosecutions does not apply when "[t]he crimes were committed *at different locations, at different times, against different victims, and with different objectives*." (*People v. Ward, supra,* 30 Cal.App.3d at p. 136, italics added.)

Here, the record shows the Uribe/Leon crimes and the Tostado kidnapping were committed at different locations, at different times, against different victims, and with different objectives. The Uribe/Leon crimes and the Tostado kidnapping obviously involved different victims. Uribe and Leon were kidnapped in early May 2007, they were held captive at the Garber Avenue residence where they were murdered, and their remains were buried in barrels at the horse ranch. The principal motive underlying the crimes appeared to be retribution for nonpayment of a $70,000 debt allegedly owed to Valencia. Tostado, however, was kidnapped in early June of that year, weeks after Uribe and Leon were murdered, and held captive at the Point Dume Court safe house until he

38

was rescued. Tostado was targeted because he was perceived to be an influential member of the AFO.

Thus, viewing the evidence in the light most favorable to the prosecution, as we must (*Valli*, *supra*, 187 Cal.App.4th at p. 794), we conclude Valencia has failed to demonstrate "the same act or course of conduct plays a significant part" (*Kellett, supra*, 63 Cal.2d at p. 827) in both the Tostado kidnapping and the Uribe/Leon crimes, and thus he has not established his prosecution for the Uribe/Leon crimes was barred under section 654 and the *Kellett* rule.

We further conclude that because Valencia's prosecution for the Uribe/Leon crimes was not barred under the section 654 prohibition of multiples prosecutions, his counsel did not provide ineffective assistance by failing to assert in the trial court that section 654 barred his prosecution for those crimes.

## II. *SUFFICIENCY OF THE EVIDENCE* (*CORROBORATION OF MORENO'S AND PENA'S ACCOMPLICE TESTIMONY*)

Beritan contends his convictions of counts 1 (attempted kidnapping of Martinez), 3 (murder of Lozano), and 4 through 7 (kidnappings and murders of Uribe and Leon) must be reversed because there was insufficient evidence, apart from the accomplice testimony of Moreno and Pena, to connect him to the commission of any of those crimes.[8] We reject this contention.

---

[8]     In his appellant's opening brief, which he filed before Beritan filed his, Valencia attempts to join in Beritan's arguments by summarily stating he "joins in any arguments raised by [Beritan] which may accrue to Valencia's benefit." Joinder is broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), "but each appellant has the burden of

39

A. *Applicable Legal Principles*

When assessing a challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Generally, the uncorroborated testimony of a single witness is sufficient to sustain a conviction or true finding on an enhancement allegation "unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the

---

demonstrating error and prejudice." (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice."].) Here, Valencia did not supply any argument on the issue of accomplice testimony corroboration as it applies to his unique circumstances. To the extent Valencia's cursory joinder is an attempt to challenge the sufficiency of the evidence corroborating the accomplice testimony of Moreno and Pena as that testimony pertains to him, his reliance solely on Beritan's arguments and reasoning is insufficient to satisfy his burden on appeal. (See *Nero*, at p. 510, fn. 11.) Accordingly, we consider this issue only as to Beritan.

testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

1. *Corroboration of accomplice testimony*

However, section 1111 prohibits a conviction based "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall *tend to connect the defendant with the commission of the offense*." (§ 1111, italics added; see *People v. McDermott* (2002) 28 Cal.4th 946, 985-986 ["A conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the offense corroborates that testimony."].)

"The corroboration required of accomplice testimony . . . need only connect the defendant to the crime sufficiently that we may conclude the jury reasonably could have been satisfied that the accomplice was telling the truth." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 185-186.) "[T]he corroborating evidence may be circumstantial, of little weight by itself, and related merely to *one part* of the accomplice's testimony." (*Id.* at p. 186, italics added; see also *People v. Abilez* (2007) 41 Cal.4th 472, 505 [such corroborative evidence may be slight or entirely circumstantial and entitled to little consideration when standing alone, and need not by itself establish every element of the crime]; *People v. Trujillo* (1948) 32 Cal.2d 105, 111 ["If [the accomplice's] testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness."].)

The trier of fact's finding on the issue of corroboration may not be disturbed on appeal unless the corroborative evidence should not have been admitted or does not

reasonably tend to connect the defendant with the commission of the crime. (*People v. Szeto* (1981) 29 Cal.3d 20, 25).

B. *Analysis*

As noted, Beritan seeks reversal of six of his eight convictions in this case—counts 1 (attempted kidnapping of Martinez), 3 (murder of Lozano), and 4 through 7 (kidnappings and murders of Uribe and Leon)—based on his claim there is insufficient independent evidence to corroborate the accomplice testimony of Moreno and Pena as it pertains to him.[9]  As discussed in the factual background, *ante*, the prosecution's case was based in part on the accomplice testimony of both Moreno and Pena.

Beritan first asserts "there was no witness, apart from Moreno and Pena, who identified [him] at all" or who testified he "ha[d] any specific role in the commission of the crimes" committed against Martinez, Lozano, Uribe and Leon.  As Beritan appears to acknowledge, corroborative evidence need not consist of direct eyewitness testimony; it may be entirely circumstantial.  (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 186.)  Specifically, Beritan asserts, and we agree, that to be sufficient for purposes of section 1111 the corroborative evidence need only provide a "thin circumstantial nexus" that tends to connect him with the commission of the crimes with which he was charged.

Beritan contends, however, that "[t]here is nothing even circumstantially suggestive from any of the witnesses" to show he had a role in the commission of any of

---

9    Beritan does not challenge on this ground his other two convictions in this case: conspiracy to kidnap Tostado for ransom (count 8) and kidnapping Tostado for ransom (count 9).

42

those crimes.  Conceding there is "ample, independent evidence of [his] participation in the Tostado kidnapping," Beritan contends that "one cannot take the independent Tostado evidence as connecting [him]" to the crimes committed against Martinez, Lozano, Uribe and Leon.  Acknowledging that Uribe and Leon were murdered at the Garber Avenue residence after they were held captive there, Beritan further contends there is no independent evidence to show he was living at the Garber Avenue residence during the commission of those crimes and, even if he was living there, "corroboration based only on presence at the scene and opportunity to commit a crime does not satisfy the requirements of section 1111."

These contentions are unavailing.  As already discussed, corroborative evidence may be circumstantial, of little weight by itself, and related merely to *one part* of an accomplice's testimony.  (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 186.)

Here, in his accomplice testimony, Moreno indicated that Los Palillos rented "safe houses" in the San Diego area to facilitate the kidnappings and other crimes they planned to commit.  He testified that the Garber Avenue residence was one of those safe houses. Moreno further testified that he spoke to Beritan and a few other members of Los Palillos about making money by kidnapping AFO members for ransom and that Beritan moved into the Garber Avenue safe house, as did Moreno's brother, Carlos Pena.  In his own accomplice testimony, Pena similarly testified that Los Palillos rented the Garber Avenue safe house in October 2006, and Pena lived there with Asere (Beritan) from that time until Los Palillos abandoned that safe house.

Independent circumstantial evidence, which Beritan disregards, corroborates Moreno's and Pena's testimony that he was living at the Garber Avenue safe house during the commission of the crimes. Nwagbo, the owner of the Garber Avenue residence, testified that in mid-October 2006 a man he knew as Ignacio Peredo signed a one-year agreement to rent the property. When the rent payments stopped, Nwagbo called Peredo, who sent a money order by overnight mail. Agent Giboney testified that Nwagbo showed him the UPS next-day airshipping envelope that was used to send the money order, and the return address was in the name of a person named Onel Jimenez. A paralegal working for the district attorney's office testified she subpoenaed the UPS records, and the receipt for the envelope shipped to Nwagbo showed it was sent by Onel Jimenez. Agent Giboney testified that Beritan was a member of Los Palillos, and both Agent Giboney and Agent Kameron Korte testified that Onel Jimenez was an alias that Beritan used.

The foregoing circumstantial evidence, which corroborates Moreno's and Pena's accomplice testimony, tends to connect Beritan to the commission of the crimes by establishing that he used his alias, Onel Jimenez, to rent the Garber Avenue safe house, and that he resided there during the commission of the crimes.

Independent circumstantial evidence also corroborates Moreno's and Pena's testimony that Beritan guarded Uribe, Leon, and other victims at Los Palillos's safe houses. Moreno testified that he and Beritan guarded Vasquez ("Kilino") at the Garber Avenue safe house while he was held captive there, that he (Moreno) and other members of Los Palillos openly communicated to one another during that time and referred to

44

Beritan by his nicknames "Asere," "Chino," "Cubano," and "Cuba," and that Beritan was the only one there who was Cuban. Moreno also testified that he and Beritan guarded another victim, Balitas, while he was held captive at the Garber Avenue safe house; Beritan was still living there when Uribe and Leon were later kidnapped and held captive there, and Beritan helped to guard them before they were strangled. Pena similarly testified that Beritan helped to guard Balitas, Vasquez, Uribe, and Leon while they were held captive at the Garber Avenue safe house.

Independent circumstantial evidence corroborates the foregoing accomplice testimony that Beritan guarded Uribe and Leon. As noted, Moreno testified that when he and Beritan guarded Vasquez at the Garber Avenue safe house, he (Moreno) and other members of Los Palillos openly referred to Beritan by his various nicknames, including "Asere" and "Cubano." Vasquez corroborated this testimony by testifying that one of the men who guarded him one was a foreigner with a Cuban or Venezuelan accent, and Vasquez knew him as "El Cubano." Tostado also gave corroborative testimony. He testified that he learned the nicknames of three of the kidnappers who held him captive at the Point Dume Court safe house, and one of them was nicknamed "Asere" (Beritan). Agent Giboney independently testified that Beritan's nicknames were "Chino" and "Asere." At trial, Tostado identified Beritan as "Asere."

In this regard, the Attorney General correctly argues that "evidence establishing that a defendant committed crimes similar to the one at issue can corroborate an accomplice's testimony." (*People v. Hannie* (1962) 202 Cal.App.2d 462, 466 ["[T]he accomplice in this case was corroborated by evidence establishing a prior burglary

45

committed under circumstances similar to the burglary here in question."].)  Here, the independent testimony of Vasquez and Tostado establishing that Beritan had assisted Los Palillos in holding them and Balitas captive corroborates Moreno's and Pena's accomplice testimony that he also assisted in holding Uribe and Leon captive before they were murdered.  (*Ibid*.)

Pena testified that Beritan helped to guard Tostado at the Point Dume Court safe house.  Beritan does not dispute that Tostado corroborated this testimony by testifying that he learned the nicknames of three of the kidnappers.

For the foregoing reasons, we conclude that sufficient evidence independent of Moreno's and Pena's accomplice testimony tends to connect Beritan to the Uribe/Leon crimes (counts 4 through 7) such that we may conclude the jury reasonably could have been satisfied that their accomplice testimony about Beritan's participation in those crimes was truthful.

We also conclude sufficient independent evidence tends to connect Beritan to the attempted kidnapping of Martinez (count 1) and the murder of Lozano (count 3) such that we may conclude the jury reasonably could have been satisfied that Moreno's accomplice testimony about Beritan's participation in those crimes was truthful.  Regarding the attempted kidnapping of Martinez, Moreno and Pena testified that they, Beritan, and other Los Palillos members met at the Garber Avenue safe house to plan the kidnapping for ransom of Martinez.  Moreno testified that the Garber Avenue safe house was still leased by Los Palillos at that time, Beritan was living there, and Martinez was going to be held captive there following his abduction.  Moreno also testified that the plan was to

46

have Arvizu lure Martinez, who was an independent drug-trafficker, to the Briarwood apartment complex on the pretext that a buyer of drugs would be there for a drug sale transaction, and some of the members of Los Palillos dressed as police officers would then "arrest" Martinez and take him to the Garber Avenue safe house. Moreno further testified Beritan would be nearby in a car acting as a lookout.

Moreno's testimony that Martinez was going to be held captive at the Garber Avenue safe house after being lured to, and "arrested" at, the Briarwood apartment complex following his abduction is corroborated by the independent testimony of Lourdes Hernandez, who testified that Arvizu drove her to the Briarwood apartment complex in his Ridgeline truck after telling her they were going to pick up cocaine and that Martinez followed them there in his Sequoia. This testimony corroborates Moreno's accomplice testimony that, as part of the kidnapping plan devised at the Garber Avenue safe house, Arvizu would lure Martinez to the Briarwood apartment complex.

Lourdes also testified that, after Martinez escaped from the attempted "arrest" and drove away, she and Arvizu picked up the men wearing police vests who had assaulted Martinez and drove them to a home in the Chula Vista area. At trial, Lourdes identified the Garber Avenue safe house as the home to which they drove after the incident.

In addition, as already discussed, substantial evidence apart from Moreno's and Pena's accomplice testimony shows that Beritan had rented the Garber Avenue safe house on behalf of Los Palillos, he lived there, and he guarded other victims there.

Although the foregoing independent evidence only provides what Beritan refers to as a "thin circumstantial nexus," it tends to connect Beritan to the commission of the

47

attempted kidnapping of Martinez such that we may conclude the jury reasonably could have been satisfied that Moreno's accomplice testimony about Beritan's participation in that crime was truthful. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 186 ["[T]he corroborating evidence may be circumstantial, of little weight by itself, and related merely to one part of the accomplice's testimony."].)

Last, the same independent evidence showing that Beritan rented the Garber Avenue safe house on behalf of Los Palillos, lived there, and guarded other victims there, also tends to connect him to the murder of Lozano, who Moreno testified was strangled to death at the Garber Avenue safe house while Beritan and other Los Palillos members were kicking him.

For all of the foregoing reasons, we affirm Beritan's convictions of counts 1, 3, and 4 through 7.

### III. *DEFENDANTS' REQUESTS FOR CORRECTION OF ERRORS IN THEIR ABSTRACTS OF JUDGMENT*

A. *Error in Both Abstracts of Judgment Regarding Count 6*

Asserting that their abstracts of judgment incorrectly reflect that their count 6 convictions were for kidnapping for ransom with bodily harm, rather than for simple kidnapping, Valencia and Beritan request that the errors be corrected. The Attorney General concedes the errors and does not oppose defendants' requests. We agree the abstracts of judgment must be corrected.

With respect to count 6, the jury found Valencia and Beritan guilty of the lesser included offense of simple kidnapping of Leon in violation of section 207, subdivision

48

(a). Their abstracts of judgment correctly reflect that they were convicted of a violation of that section. However, Valencia's abstract of judgment incorrectly identifies his count 6 offense as "kidnap ransom, bodily harm," and Beritan's abstract of judgment similarly identifies his count 6 offense as "kidnap, ransom bodily harm."

Beritan correctly points out that kidnapping for ransom with bodily harm is a violation of section 209, subdivision (a), not of section 207, subdivision (a). Thus, we conclude defendants' abstracts of judgments should be corrected to reflect that their count 6 convictions (§ 207, subd. (a)) were for the lesser included offense of simple kidnapping, not for kidnapping for ransom with bodily harm.

B. *Duplicative Count 7 Multiple-murder Special Circumstance Enhancement* (*Valencia's Abstract of Judgment*)

Valencia also claims the court erroneously imposed *two* prison terms of life without the possibility of parole (LWOP)—one for each of the murders charged in counts 5 and 7 of which he was convicted—based on the jury's true finding on the multiple-murder special circumstance allegation under section 190.2, subdivision (a)(3) (hereafter referred to as section 190.2(a)(3)).[10] Citing *People v. Danks* (2004) 32 Cal.4th 269 and *People v. Diaz* (1992) 3 Cal.4th 495, he argues the court was authorized to impose only *one* LWOP sentence enhancement for the multiple-murder special circumstance.

---

[10]     Section 190.2(a)(3) provides: "(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:  [¶] . . . [¶] (3) The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree."

49

Valencia acknowledges, however, that the court was authorized to impose consecutive LWOP prison terms on counts 5 and 7 because one of those LWOP enhancements was authorized based on the jury's true findings on the gang-murder special circumstance allegations under section 190.2, subdivision (a)(22) (hereafter referred to as section 190.2(a)(22)).[11]  He asserts the appropriate remedy is to allow his count 7 LWOP sentence to remain "in light of the remaining gang special circumstance finding" under section 190.2(a)(22), and to amend his abstract of judgment to delete as to count 7 the reference to an enhancement under section 190.2(a)(3).

The Attorney General agrees, noting in the petition for rehearing that "a properly imposed gang[-]murder special circumstance applies to count 7," and thus "Valencia's sentence on that count remains life without the possibility of parole."

1. *Background*

The prosecution charged Valencia with a multiple-murder special circumstance, alleging that "in this proceeding [he] has been convicted of more than one offense of murder in the first or second degree, within the meaning of Penal Code section 190.2(a)(3)."  As to each of the first degree murders charged in counts 5 and 7, the prosecution also charged Valencia with a gang-murder special circumstance (§

---

[11]     Section 190.2(a)(22) provides:  "(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:  [¶] . . . [¶] (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.

190.2(a)(22)), alleging he committed the murder while he was an active participant in a criminal street gang and he carried out the murder to further the activities of the gang. The jury found Valencia guilty of counts 5 and 7, and found the multiple-murder special circumstance allegation and the gang-murder special circumstance allegations to be true.

For Valencia's count 5 conviction, the court sentenced him to life without the possibility of parole, stating: "For Count 5, the murder of Mr. Uribe with the findings of active gang participation, *multiple murders*, and the gang allegation, probation is denied. You're committed to the Department of Corrections and Rehabilitation[] for life without the possibility of parole." (Italics added.)

For Valencia's count 7 conviction, the court sentenced him to another and consecutive term of life without the possibility of parole, stating: "In light of Count 7, which is the murder of Mr. Leon with the finding of the active gang participation, the *multiple murders*, and the gang allegation. In that case, then, you're committed to the Department of Corrections and Rehabilitation for life without the possibility of parole to be served consecutive[ly] or in addition to the life without the possibility of parole imposed in Count 5." (Italics added.)

a. *Abstract of judgment*

As pertinent here, Valencia's indeterminate abstract of judgment reflects that the court sentenced him to an LWOP prison term on count 5 and to a consecutive LWOP prison term on count 7. The abstract of judgment also reflects that each of the LWOP sentences was an enhancement imposed as a result of the true findings on the gang-murder special circumstance allegations (citing "PC190.2(a)(22)" as to both count 5 and

51

count 7) and the true finding on the multiple-murder special circumstance allegation (citing "PC190.2(a)(3)" as to both counts).

2. *Analysis*

In *People v. Danks, supra,* 32 Cal.4th at page 315, the California Supreme Court explained that "section 190.2, subdivision (a)(3) provides as a special circumstance that '[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree.' *Section 190.2, subdivision (a)(3) does not permit a separate multiple-murder special circumstance to be attached to each murder conviction* sustained in the capital case because such duplicative use of multiple-murder special circumstances 'artificially inflates the seriousness of the defendant's conduct.'" (Italics added.)

In *People v. Diaz, supra,* 3 Cal.4th at page 565, the Supreme Court also explained that "[w]hen a defendant kills more than one person, the prosecution should allege only one multiple-murder special circumstance; to charge more than one such special circumstance would improperly inflate the seriousness of the defendant's conduct." In *Diaz*, after the defendant waived his right to a jury trial, the trial court convicted him of 12 counts of first degree murder and found to be true 12 multiple-murder special-circumstance allegations (§ 190.2, subd. (a)(3)). (*Diaz*, at p. 517.) The *Diaz* court agreed with the defendant's argument that 11 of the 12 multiple-murder special circumstances should be stricken as duplicative. (*Id.* at p. 565.)

Here, the court erroneously imposed *two* LWOP sentences—one on count 5 and a second on count 7—based on the multiple-murder special circumstance. The court was

52

authorized to impose only *one* LWOP sentence enhancement based on that special circumstance. (*People v. Danks*, *supra*, 32 Cal.4th at p. 315; *People v. Diaz*, *supra*, 3 Cal.4th at p. 565.) On rehearing, we agree with the parties that the appropriate disposition as to Valencia regarding count 7 is to affirm his LWOP sentence in light of the properly imposed count 7 gang-murder special circumstance, and order that his abstract of judgment be amended to delete as to count 7 the reference to an enhancement under section 190.2(a)(3).

C. *Gang Enhancements*

Last, Valencia contends his abstract of judgment incorrectly indicates he received a gang-enhancement sentence of life without the possibility of parole for each of the jury's true findings on the gang enhancement allegations (§ 186.22, subd. (b)(1)) attached to counts 5 (murder of Uribe) and 7 (murder of Leon). Citing *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), Valencia asserts that because he received a sentence of life without the possibility of parole for each of his count 5 and count 7 gang-related murder convictions, "the sentence provided by law for [each] gang enhancement is generally a minimum parole eligibility term of 15 years." Thus, he argues, the count 5 and count 7 LWOP gang enhancements reflected in his abstract of judgment are unauthorized.

Beritan similarly argues that because he received sentences of life without the possibility of parole for each of his three gang-related murder convictions (counts 3, 5 & 7) and each of his two gang-related kidnapping-for-ransom-with-bodily-injury convictions (counts 4 & 9), the LWOP gang enhancements for those five counts (3, 4, 5, 7 & 9) reflected in his abstract of judgment are unauthorized.

53

The Attorney General concurs in Valencia's and Beritan's arguments, and, citing section 186.22, subdivision (b)(5) (hereafter section 186.22(b)(5)), concedes that "[t]he appropriate sentence for the gang enhancements on all of these counts is *life with a minimum parole eligibility* [*sic*] *after 15 years*."

We accept the Attorney General's concession that defendants' abstracts of judgment should be corrected to reflect the imposition of a gang-enhancement consisting of a 15-year minimum parole eligibility term under 186.22(b)(5), rather than an LWOP term, for each gang enhancement. In *Lopez*, *supra*, 34 Cal.4th at page 1004, the California Supreme Court explained that "section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang." Section 186.22(b)(5), which is applicable here, provides in part that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for *life shall not be paroled until a minimum of 15 calendar years have been served*." (Italics added.) Thus, under section 186.22(b)(5), gang-related felony convictions punishable by imprisonment in the state prison for life carry a 15-year minimum parole eligibility term. (§ 186.22(b)(5); *Lopez*, *supra*, 34 Cal.4th at p. 1004.)

1. *Valencia*

Here, the court sentenced Valencia to consecutive LWOP prison terms for his count 5 and count 7 murder convictions. The jury found Valencia committed each of those murders for the benefit of a criminal street gang within the meaning of section 186.22, subd. (b)(1). Thus, under section 186.22(b)(5), each of Valencia's gang-related

54

murder convictions carries a gang enhancement consisting of a 15-year minimum parole eligibility term. (*Lopez*, *supra*, 34 Cal.4th at p. 1004.)

However, Valencia's abstract of judgment currently reflects that each of his count 5 and count 7 gang enhancements consists of an unauthorized LWOP term. Thus, Valencia's abstract of judgment should be corrected by deleting the count 5 and count 7 gang-enhancement LWOP terms and replacing those unauthorized terms with 15-year minimum parole eligibility terms under section 186.22(b)(5). (*Lopez*, *supra*, 34 Cal.4th at p. 1004.) We note that these corrections, although required by the provisions of section 186.22(b)(5), appear to be of academic importance only because the section 186.22(b)(5) gang enhancements "enhance" the LWOP sentences imposed for Valencia's count 5 and count 7 murder convictions. By definition, an LWOP sentence means the defendant is not eligible for parole and thus imposition of a 15-year minimum parole eligibility term as a gang "enhancement" under section 186.22(b)(5) is of no consequence.

2. *Beritan*

The court also sentenced Beritan to consecutive LWOP prison terms for his convictions of counts 3, 4, 5, 7, and 9. The jury found Beritan committed each of those felonies for the benefit of a criminal street gang within the meaning of section 186.22, subd. (b)(1). Thus, under section 186.22(b)(5), each of Beritan's gang-related convictions carries a gang enhancement consisting of a 15-year minimum parole eligibility term. (*Lopez*, *supra*, 34 Cal.4th at p. 1004.)

55

However, Beritan's abstract of judgment currently reflects that each of his gang enhancements consists of an unauthorized LWOP term. Thus, Beritan's abstract of judgment should be corrected by deleting the gang-enhancement LWOP terms (in counts 3, 4, 5, 7 & 9) and replacing those unauthorized terms with 15-year minimum parole eligibility terms under section 186.22(b)(5). (*Lopez*, *supra*, 34 Cal.4th at p. 1004.)

DISPOSITION

Valencia's and Beritan's judgments are affirmed, including Valencia's count 7 prison sentence of life without the possibility of parole. The trial court is directed (1) to correct Valencia's and Beritan's abstracts of judgment to reflect that their count 6 convictions (§ 207, subd. (a)) were for the lesser included offense of simple kidnapping, not for kidnapping for ransom with bodily harm; (2) to amend Valencia's abstract of judgment by deleting as to count 7 the reference to an enhancement under section 190.2(a)(3); (3) to correct Valencia's abstract of judgment by deleting the count 5 and count 7 gang-enhancement LWOP terms and replacing those terms with 15-year minimum parole eligibility terms under section 186.22(b)(5); and (4) to correct Beritan's abstract of judgment by deleting the gang-enhancement LWOP terms as to counts 3, 4, 5, 7, and 9 and replacing those terms with 15-year minimum parole eligibility terms under section 186.22(b)(5). The superior court is also directed to

56

forward certified copies of the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.